UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ROBERT A. POLIMENI, DEBORAH
POLIMENI, and ROBERT J. POLIMENI

              Plaintiffs,

    -vs-

ESTATE OF ELLA RENCKERT, MURCY
BURFOOT, THE MONROE COUNTY
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, THE MONROE COUNTY CHILD
PROTECTIVE SERVICES, MARY GREENE,
SANDRA CLARK, GEORGE REYNGOUDT,
JANET SPENCER, GLADYS GARCIA, PAULA
KITTLEBERGER, THE ROCHESTER POLICE
DEPARTMENT and KNOWN AND UNKNOWN
MEMBERS OF THE ROCHESTER POLICE
DEPARTMENT,

              Defendants.

**DECISION and ORDER
No.6:05-CV-6108T(F)**

---

## I.    Introduction

Robert A. Polimeni, Deborah Polimeni, and their son, Robert J. Polimeni (collectively, "the Polimenis" or "Plaintiffs"), instituted this action pursuant to 42 U.S.C. §§ 1983 and 1988, alleging violations of their rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Presently before the Court is the motion for summary judgment on behalf of the Estate of Ella Renckert and Murcy Burfoot[1]

---

[1]   Renckert and Burfoot died during the pendency of this action. The State Defendants' attorney filed suggestions of death upon the record with regard to Renckert on May 21, 2013 (Dkt #46), and with regard to Burfoot, on May 21, 2014 (Dkt #76).

(collectively, "the State Defendants"), to dismiss them as parties from this action.

## II.  Factual Background[2]

The Polimenis are owners of four daycare facilities in the County of Monroe, New York, operating under their corporation Wee Luv Childcare, Inc. At all relevant times, the Polimenis' daycare facilities were licensed as Group Family Day Care centers by the New York State Office for Children and Family Services ("OCFS"). Mr. and Mrs. Polimeni were entitled to, and did receive, referrals from Monroe County of parents entitled to subsidized child care. Renckert was the Regional Manager of OCFS. Burfoot was the Supervisor of the Bureau of Early Childhood Services ("BECS") of OCFS, and reported to Renckert.

There are two incidents implicating the State Defendants described in the complaint. The first occurred in 2003, and stemmed from Plaintiffs' provision of temporary foster-care to two children. The second occurred in 2004, and revolved around the discovery of guns and ammunition by the police at one of Plaintiffs' daycare facilities. These incidents will discussed in turn below.

---

[2]

The factual summary is taken from the pleadings and the parties' submissions on the current motion. Citations to deposition transcripts are in parentheses with the deposed party's last name followed by the relevant page numbers.

### 1.   The Grant Children Foster-Care Situation

In 2003, Sharita Grant ("Mrs. Grant") was a client of Plaintiffs' and regularly brought her two children ("the Grant children") to Plaintiffs' daycare. In late September, Mrs. Grant was hospitalized. Judy Gradford ("Gradford") of Monroe County Child Protective Services ("CPS")[3] asked Mrs. Polimeni if she would provide temporary foster-care to the Grant children. Mrs. Polimeni expressed concern about obtaining the proper authorization first, as their facilities were not licensed to provide foster-care. Gradford assured her it would be forthcoming. Mrs. Polimeni took the Grant children into foster care on September 26, 2003. During the time she had the Grant children, Mrs. Polimeni never received written authorization despite repeated requests to CPS and OCFS. Mrs. Polimeni left voicemails with various CPS employees, including Gladys Garcia ("Garcia"), complaining about the way the Grant situation was being handled and that she did not have adequate supplies for the children. Mrs. Polimeni testified that she did not believe that CPS and OCFS handled the situation professionally and that she was not reimbursed adequately for the amount of care she provided and the liability she understood with regard to the Grant children.

---

[3] Plaintiffs use Monroe County Department of Health and Human Services ("DHS") and CPS interchangeably. The Court will refer to these entities collectively as "the County."

On October 13, 2003, Mrs. Grant was released from the hospital. No one from CPS or OCFS contacted the Polimenis about returning the Grant children to their mother that day. Mrs. Polimeni made a number of unsuccessful attempts to contact Mrs. Grant and even stopped by her residence, but Mrs. Grant was not there. Mrs. Polimeni proceeded to the home of Michelle Rogers ("Rogers"), one of the individuals authorized by Mrs. Grant to receive the children, according to the signed permission slip in Plaintiffs' file. Mrs. Polimeni spoke to Rogers, who agreed to take the children.

On October 14, 2003, the day after Mrs. Polimeni dropped off the Grant children, Garcia of CPS called Mrs. Polimeni and told her there was "an issue" because Mrs. Polimeni had no right to drop off the Grant children with Rogers. Mrs. Polimeni assured Garcia that she had authorization from Mrs. Grant to do so and agreed to fax Garcia the permission slip signed by Mrs. Grant authorizing Rogers to receive the children. Garcia then told Mrs. Polimeni that the DHS had "other issues" about Plaintiffs' daycare operations and that the County would be paying "special attention" to all of the children in their care. Garcia said that there was "going to be a meeting between Paula Kittelberger and, [she] believe[d], OCFS

regarding lodging an official complaint against [her] for the drop off the Grant children to Michelle Rogers." (Polimeni: 368).[4]

Garcia also informed Mrs. Polimeni that she was removing two school-aged children from Plaintiffs' care because "the parent didn't need to have care for the school-age children because the parent ended her program at 3 and . . . it didn't make sense for them to come to the daycare for a few hours, although her other two children. . . would continue in care 'til 5 p.m." (Polimeni: 369). Garcia told Mrs. Polimeni she believed that it was a "waste" of money to have these children in daycare. (Id.).

Mrs. Polimeni testified that the Grant children did not return to Plaintiffs' daycare after October 13th, and Mrs. Polimeni never learned why. (Polimeni: 375). The Notice of Decision she received later in October 2003 from Garcia and Kittleberger of CPS simply stated that the Grant children were no longer attending daycare with Plaintiffs. See id. Mrs. Polimeni testified that beginning on October 14, 2003, other children were involuntarily discontinued as Plaintiffs' clients, and parents were denied referrals to enroll their children into Plaintiffs' daycare facilities, without explanation. See Declaration of Deborah Polimeni ("D. Polimeni Decl."), ¶¶ 14-21 & Exhibits ("Exs.") J, K, & L (detailing instances of children being terminated from Plaintiffs' daycare or

---

[4]     No complaint, formal or otherwise, ever was lodged with regard to the Grant children's placement with Wee Luv.

being denied approval to enroll in Plaintiffs' daycare) (Dkt #72-3).

### 2.    The Search of 641 Jay Street

The two-story apartment at 641 Jay Street housed two of Plaintiffs' daycare facilities. The upstairs facility was operated by the Polimenis' son, Robert J. Polimeni; the downstairs facility was separately licensed and operated by his father, Robert A. Polimeni.

At about 10:30 p.m. on May 4, 2004, Investigator David Mace ("Inv. Mace") and Investigator John F. Muller ("Inv. Muller") of the Rochester Police Department ("RPD") were in a patrol car parked on Jay Street when they saw a man, carrying what appeared to be a rifle case, run across the street from 642 Jay Street and enter 641 Jay Street. The investigators proceeded to 641 Jay Street and knocked on the door, which was answered by Robert J. Polimeni. Juan Rivera ("Rivera"), the man they had seen running across Jay Street, was there, along with three other men who were visiting Robert J. Polimeni. Rivera led them to a bedroom closet where they found the rifle case, which contained a Stevens .22-caliber rifle along with a box of .22-caliber ammunition and a fully loaded .22-caliber magazine. See Field Information Form ("FIF"), Deposition Exhibit ("Dep. Ex.") 6, attached as Ex. D to Plaintiffs' Opposition (Dkt #72-4, pp. 8-9 of 71). Rivera said he had recently purchased the rifle in the case from Walmart and wanted to show it to his

friends. Id. Inv. Mace testified that in the same room where he recovered the rifle case, there were two cribs with a changing area; he said he learned during the visit that the apartment was a licensed daycare facility. (Mace: 33-34). The investigators also found a Marlin .22-caliber rifle and a Beretta 12-gauge shotgun, which were unloaded. All of the guns were properly registered but did not have trigger locks. Inv. Muller indicated in the FIF that Inv. Mace was going to call OCFS and inform them of the situation. See id.

Inv. Mace testified that a few days later, he called the main phone number on the OCFS website, and spoke to a man whose name he could not recall about the discovery of guns at 641 Jay Street. (Mace: 39). He explained as an RPD officer he was a mandated reporter of suspected child mistreatment, and although he did not suspect mistreatment occurring at 641 Jay Street, he was concerned about the safety hazard presented by the presence of guns; his objective was to advise OCFS to contact the daycare facility and "get those guns secured." (Mace: 40). The man at OCFS to whom Inv. Mace spoke said OCFS would not "take the referral" because there were no children at the premises. (Mace: 44).

Inv. Mace then contacted Jennifer Gregory ("Gregory")[5] on her cell phone. Gregory was a social worker with whom he had worked in the past. She was not an employee of the RPD but had worked under

---

[5] Gregory has not been deposed in this matter.

contract with the RPD on something called "the SafeKids grant". Inv. Mace asked Gregory to verify what the OCFS representative had told him. (Mace: 44, 46, 48-49). According to Inv. Mace, Gregory told him that OCFS "should have taken the referral." (Mace: 50). Gregory told Inv. Mace "she would contact whoever; she would make the call." (Id.) Inv. Mace did not know who Gregory intended to call, and he did not talk to her again about this. (Id.: 50-51). Inv. Mace did not remember talking to anyone else about the search at 641 Jay Street, and he had no further involvement with it after talking to Gregory. (Id.: 52, 53).

Gregory's name appears on a document titled "Office of Children and Family Services Child Protective Services Intake Report" ("the CPS Report") which was marked as Dep. Ex. 4. See Declaration of Gary Levine, Esq. ("Levine Decl."), Ex. G (Dkt #62-3, pp. 195-96 of 201). The CPS Report, which for some reason is dated March 2005, almost a year after the incident, lists the "Reporter" as Linda Cupo, whose "Relationship" is listed as "DSS Worker". Under "Source Information", it lists "Jennifer Gregory", whose relationship is listed as "Law Enforcement." Under "Safety Factors," the report states "weapon noted in CPS report or found in the home." At the very top of the page, the CPS Report lists three "Unknown Unknown[s]" numbered 02, 03, and 04. To the right of each Unknown Unknown is the term, "Inadequate Guardianship", and to the right of that, "01 Juan Rivera, Junior" is listed three times. Id.

On the second page, under "Call narrative," the Intake Report states that

> [y]esterday, Juan, who is the director of 'We Love Kids' day care, was seen entering the day care home with a gun case. Upon investigation, several guns and ammunition were found stored under changing tables and cribs there.

Id., p. 196 of 201. Underneath the heading "Miscellaneous Information", the CPS Report states that

> [r]eporter [i.e., Gregory] works for the Safe Kids program, out of the Rochester police department Maple Section. The 2 investigators that approached Mr. Rivera are Dave Mace and Investigator Mueller of the Maple section. Mr. Rivera has licenses on the wall for day care. Reporter has no further information.

Id. Sandra Clarke ("Clarke"), a CPS caseworker with DHHS, testified that Gregory was the source of the original complaint regarding 641 Jay Street, which went first to the state central registry in Albany and then was distributed back to the originating county. (Clarke: 101, 102). It appears that the document quoted above is the original complaint described by Clarke.

Clarke was assigned, on behalf of the County, to investigate the CPS Report regarding 641 Jay Street. She testified that once CPS receives a referral from the State, they are obligated to assess the situation within 24 hours. (Clarke: 102). On May 14, 2004, Clarke sent a letter on Monroe County DHHS letterhead to Robert J. Polimeni informing him that a report was made to the OCFS Child Abuse and Maltreatment Register on May 7, 2004, alleging he was responsible for maltreatment of three named children and one

-9-

unknown child at 641 Jay Street, and that the report had been transmitted to the Monroe County CPS for an investigation. Dkt #72-4, pp. 4-5 of 71. Clarke testified that she received no direction from Renckert or anyone else at OCFS about how to proceed with the investigation. (Clarke: 107).

OCFS employee Nancy Marion ("Marion"), the licensor[6] assigned to Plaintiffs at the time, was assigned on behalf of the State to investigate the complaint about 641 Jay Street. Marion, testified that on May 7, 2004, her supervisor[7] at the time, James Piersa ("Piersa"), handed her the CPS Report mentioning guns, drugs, and drug paraphernalia found at 641 Jay Street, and told her to enter it into the OCFS computer system as a daycare complaint. (Marion: 41, 43-44, 52:22-25).

Also on May 7, 2004, Piersa brought Marion a copy of Dep. Ex. 8, which Marion identified as an email sent on May 7, 2004, at 4:33 p.m., from Terry Romeo ("Romeo") to Renckert, cc'd to Burfoot, and sent with "high importance." (Marion: 127:20-23). Marion testified that the Romeo email[8] was "regarding Murcy Burfoot's

---

[6]
According to Marion, Renckert was responsible for assigning licensors to various daycare facilities, and assigned Marion to Plaintiffs' account. (Marion: 17: 3-19). Marion could not recall when, but it must have been at some point after the situation with the Grant children (since Jo Zimmerman was Plaintiffs' licensor at that point) and May of 2004.

[7]
Marion also reported "intermittently" to Renckert, who was above both Marion and Piersa in the OFCS hierarchy.

[8]
Plaintiffs have not identified who Terry Romeo is, and this individual was not deposed. Plaintiffs intended to attach the Romeo email to their opposition

information shared with Terry Romeo" which "dealt with the drug bust at Jay Street and the allegation that Robert Polimeni was found with drugs and drug paraphernalia." (Marion: 50:20-51:6; see also Marion: 53:3-11 (Attorney Jeff Wicks quoting email as stating that on May 6, 2004, "'Murcy [Burfoot] shared information received from Officer Mace,[9] Rochester Police Department, Maple Section,' and it says, 'During a drug bust on his shift, 5/5 to 5/6, he entered 641 Jay Street upstairs apartment where he found Robert Polimeni with drugs, unspecified, and drug paraphernalia. Robert admitted to being a child-care provider.'")). Piersa instructed Marion to add this information to the OCFS computer system. (Marion: 53:20-22, 56:14-18). Marion never spoke directly to Burfoot or Renckert about the Romeo email or Burfoot's apparent communication with Inv. Mace.   Marion, concerned that OCFS could suspend Plaintiffs' license due to the allegations in the CPS report, discussed with Mrs. Polimeni the possibility of voluntarily closing operations at 641 Jay Street during the pendency of the investigation. (Marion: 76). Mrs. Polimeni agreed, and said that the children being cared for at 641 Jay Street could be cared for at one of their other licensed facilities. (Id.). Marion testified

---

papers; for instance, Mrs. Polimeni references the Romeo email in her declaration and purports to attach it as Exhibit C. See D. Polimeni Decl., ¶ 54 (citing Ex. C). While there is a cover sheet stating "Ex. C", there is no actual Exhibit C (i.e., there is no copy of the Romeo email) attached.

[9]     As discussed further below, when Inv. Mace was shown Dep. Ex. 8, he testified that he was not familiar with Burfoot's or Renckert's names, and had no recollection of speaking with them. (Mace: 37-38).

that a CPS report and investigation can result in a "hold" being placed on a daycare facility; a "hold" means that the facility cannot accept any referrals. Marion did not know of any "holds" placed on Plaintiffs' facilities except for the one that was imposed from the filing of the complaint until the completion of the investigation into 641 Jay Street. (Marion: 247-48).

Ultimately, the complaint in the CPS Report regarding the guns was found to be "unsubstantiated": Both Marion and Clarke testified that they independently concluded that there was no evidence to support the complaint's allegations. (Marion: 236-37; Clarke: 103-04). See also Letter from Marion & Piersa (Dep. Ex. 10), attached as Ex. G to Levine Decl. (Dkt #62-3, pp. 197-201). In her Report of Allegations, Marion summarized her findings that the guns were properly stored and not accessible to children, there was no evidence of drug use at 641 Jay Street, and Rivera (who had been carrying the gun case), was not the "director" of this daycare (contrary to what was indicated in the initial complaint).[10]

## III. Summary Judgment Standard

When the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of

---

[10]
    The Court notes that the letter dated July 15, 2004, from Marion and Piersa to Robert, indicating that the complaint was found to be unsubstantiated, contains inconsistent dates. It states that the complaint was filed on May 11, 2004, but also states the investigation into the complaint was completed on May 10, 2004. See Letter from Marion & Piersa (Dep. Ex. 10), attached as Ex. G to Levine Decl. (Dkt #62-3, pp. 197-201).

material fact in dispute and that one party is entitled to judgment as a matter of law, summary judgment is appropriate. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material fact*[,]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). Material facts are those "that might affect the outcome of the suit under the governing law[.]" Id. Once the movant has demonstrated that no genuine issue of material fact exists, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine* issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(e)) (emphasis in original). In other words, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. The party opposing summary dismissal "must do more than make broad factual allegations and invoke the appropriate statute" but "must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citing Anderson, 477 U.S. at 250). The non-moving must do more than simply present "conclusory

allegations or unsubstantiated speculation." <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998).

**IV.   Discussion**

The State Defendants base their motion for summary judgment primarily on their lack of personal involvement in any of the challenged actions. <u>See</u> <u>Feingold v. N.Y.</u>, 366 F.3d 138, 159 (2d Cir. 2004) ("A finding of 'personal involvement of [the individual] defendants' in an alleged constitutional deprivation is a prerequisite to an award of damages under [42 U.S.C.] Section 1983.") (quoting <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 154 (2d Cir. 2001) (internal quotation marks omitted in <u>Feingold</u>)).

Plaintiffs have asserted multiple causes of action within each enumerated cause of action. <u>See</u> Complaint ("Compl."), ¶¶ 65-68; 70-71. The Third and Fourth Causes of Action are relevant here, since they particularly name the State Defendants.

**A.   Conspiracy to Conduct Unlawful Search**

Plaintiffs allege in the Third Cause of Action that the State Defendants conspired with CPS, the RPD, and Inv. Mace and Inv. Muller to violate their Fourth Amendment right to be free from unreasonable searches and seizures, by conducting an unlawful search of the daycare facility at 641 Jay Street. <u>See</u> Compl., ¶ 66.

"Conspiracies to deprive a person of his constitutional rights are cognizable under § 1983, which does not require a showing of racial or class-based discrimination as a prerequisite to

liability." Duff v. Coughlin, 794 F. Supp. 521, 525 (S.D.N.Y. 1992). To establish a § 1983 conspiracy claim, a plaintiff must show that the defendants "acted in a willful manner, culminating in an agreement, understanding, or 'meeting of the minds,' that violated plaintiff's rights, privileges, or immunities secured by the Constitution or federal courts to violate his rights." Id. (quoting Katz v. Morgenthau, 709 F. Supp. 1219, 1231 (S.D.N.Y.), rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989); 42 U.S.C. § 1983). Vague and conclusory allegations suggesting or implying a conspiracy are insufficient to succeed under § 1983. See Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators").

Plaintiffs have failed to come forward with evidence in admissible form suggesting that there is a triable issue of fact whether an agreement or understanding existed among the State Defendants, CPS, RPD, and Inv. Mace and Inv. Muller to conduct the search of 641 Jay Street on May 4, 2004. Likewise, Plaintiffs have failed to come forward with evidence in admissible form suggesting that there is a triable issue of fact as to whether Renckert or Burfoot were personally involved in the May 4, 2004 incident. When asked if she knew of any evidence that the State Defendants were connected with the police officers who conducted the search,

Mrs. Polimeni responded with speculation: "I only know that Ella Renckert utilizes outside agencies for things she's pursuing." (Polimeni 934:13-25). Mrs. Polimeni admitted that she had no evidence that Renckert was "utilizing" the RPD in this fashion when the officers searched 641 Jay Street on May 4, 2004. (Id.) When questioned specifically whether she had any evidence that Burfoot or Renckert "had any role to play" in the search of 641 Jay Street, Mrs. Polimeni admitted, "I don't have anything." (Id. 935:2-17). For their part, Inv. Mace and Inv. Muller testified that no one from OCFS had any input into their decision to stop and search 641 Jay Street on the night of May 4, 2004. In short, there is an absence of record evidence that the State Defendants ever communicated in any fashion with any of the other defendants prior to the May 4, 2004 incident. See Berhanu v. New York State Ins. Fund, Nos. 91CIV.4956-BSJ, 91CIV.6088-BSJ, 93CIV.6891-BSJ, 1999 WL 813437, at *19 (S.D.N.Y. Oct. 8, 1999) ("There is a complete lack of any evidence that the defendants communicated with one another about anything other than plaintiff's general employment history (i.e., positions held, dates of employment, previous salary and benefits). Such communication does not establish an agreement to deprive plaintiff of his constitutional rights."). Accordingly, the Court fails to find a genuine issue of triable fact with regard to Plaintiffs' claim that Burfoot and Renckert conspired with the

other defendants to violate Plaintiff's Fourth Amendment rights by executing a warrantless search at 641 Jay Street.

### B.    Conspiracy to File False Report

Plaintiffs also assert in the Third Cause of Action that the State Defendants, CPS, the RPD, Inv. Mace, and Inv. Muller conspired to file false allegations to BECS based on the search of 641 Jay Street to harass Plaintiffs, harm their reputation, and deprive them of daycare referrals. See Compl., ¶ 66. Plaintiffs assert in the Fourth Cause of Action that the State Defendants and the County conspired to make false allegations and reports based upon the search of 641 Jay Street. See id., ¶¶ 70-71.

Plaintiffs argue that "the smoking gun" proving that the State Defendants conspired with the County defendants and the RPD investigators to file a false report based on the search of 641 Jay Street is the Romeo email to Renckert. As discussed above, the Romeo emails states in part that on May 6, 2004, "[Burfoot] shared information received from Officer Mace" that "[d]uring a drug bust on his shift, 5/5 to 5/6, he entered 641 Jay Street upstairs apartment where he found Robert Polimeni with drugs, unspecified, and drug paraphernalia," and "Robert admitted to being a child-care provider." (Marion 53:3-11; see also 50:20-51:6).[11] When Inv. Mace

---

[11]    As noted above Plaintiffs failed to attach a copy of this email to their opposition papers, but the Court has gleaned some of the content of the email from Marion's deposition testimony.

was shown a copy of the Romeo email, he testified that he was not familiar with Renckert's name or Burfoot's name, and did not recall communicating with either of them at any point. (Mace: 37-38, 51, 61-62). Nor did Inv. Muller. (Muller: 44). As noted above, the writer of the email, Romeo, has not been identified and has not been deposed. For some reason, Plaintiffs' attorneys never deposed Renckert and Burfoot while they were alive.

Even assuming <u>arguendo</u> that the information in the Romeo email was false, there is no evidence that Burfoot or Renckert knew or should have known it was false. Marion admitted that the CPS Report was not generated by OCFS, and instead originated from CPS. (Marion 282:7-8). Marion nevertheless believed that Renckert had some involvement in the wording of the allegation in the CPS Report to the effect that guns and ammunition were found under changing tables and cribs because "that's the only way CPS would have taken that as a report. You had to make it related to child care, and that did it." (Marion 281:14-282:12). Based on the cross-examination of Marion, it appears that the CPS Report was "called in, according to Exhibit 4-A[12] at 5:10 p.m.", and the Romeo email was sent at 4:33 p.m. (Marion: 52:11-12, 298:12-17). Thus, the Romeo email was sent to Renckert before the CPS Report came in. However, as noted above, the CPS Report did not originate from OCFS. Plaintiffs essentially are asking the Court to speculate that

---

12

The Court has not been provided with a copy of Dep. Ex. 4-A.

Renckert provided information to one or more of the individuals involved in producing the CPS Report. As noted above, Linda Cupo ("Cupo") of DSS was the "Reporter" on the CPS Report. Cupo was not deposed and has not submitted a sworn statement. Gregory was the "Source Information". Again, Gregory was not deposed and has not submitted a sworn statement. And, to reiterate, Romeo was not deposed and has not submitted a sworn statement. The Court has before it no evidence in any form from any of the individuals directly involved in the CPS Report and the Romeo email. The Court thus is being asked to rely on rank speculation and conjecture to find the requisite level of personal involvement on the part of Burfoot and Renckert in generating and filing the CPS Report. This is plainly insufficient. See Rockland Vending Corp. v. Creen, No. 07-CV-6268(KMK), 2009 WL 2407658, at *16 (S.D.N.Y. Aug. 4, 2009) ("Plaintiffs' assertion that this testimony supports the inference that Kidder was personally involved in the renewal or termination of Rockland's contracts is based only on speculation.") (citing ITC Ltd. v. Punchgini, Inc., 518 F.3d 159, 163 (2d Cir. 2008) ("Conjecture, of course, is insufficient to withstand summary judgment.")).

With regard to the allegedly retaliatory removal of children and denial of referrals as retaliation, Mrs. Polimeni's deposition testimony undermines her claims that the State Defendants were involved in any wrongdoing. When asked by defense counsel whether

she claimed that Renckert and Burfoot had any role in the removal
or children or denial of referrals, Mrs. Polimeni testified:

> I believe–based on past history, if I'm denied parent
> choice or a parent is denied parent choice [to place
> their children in a specific daycare], they [Renckert and
> Burfoot] have intervened to assist in this . . . .

(Polimeni 398:10-19). Mrs. Polimeni's present accusation against
Renckert and Burfoot seems to be only that they "did not do enough"
when County denied referrals after the Grant children situation.
(Id. 399:4-8). However, Plaintiffs have pointed to no authority for
the proposition that Renckert or Burfoot, who worked for a State
agency, were legally obligated, much less permitted, to intervene
in the County's placement of children handling of referrals.
Plaintiffs have failed to demonstrate any non-speculative basis for
imposing liability on the State Defendants in this regard.  Cf.
Cuoco v. Moritsugu, 222 F.3d 99, 111 (2d Cir. 2000) (finding that
non-doctors were entitled to qualified immunity for their failure
to intercede in the medical treatment of an inmate).

### C.  Conspiracy to Retaliate

In the Third Cause of Action, Plaintiffs allege that "[t]he
CPS and OCFS Defendants conspired with Defendant RPD and the
individual RPD members" to harass and harm them "in  retaliation .
. . for their verbal and written complaints of the improper
practices of the CPS and OCFS Defendants with regard to the
mishandling and improper conduct regarding the Grant children

foster placement[.]" Compl., ¶ 67. The actions that "harm[ed] and harass[ed]" Plaintiffs apparently were (1) the unlawful search of 641 Jay Street, and (2) the filing of the false report based on the search.

To plead a First Amendment retaliation claim, a plaintiff must show the following: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendants actions caused him some injury." Dorsett v. County of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). The Second Circuit has articulated the elements of a First Amendment retaliation claim "in several ways, depending on the factual context[,]" Williams v. Town of Greenburgh, 535 F.3d 71 (2d Cir. 2008) (citations omitted). "Regardless of factual context," the Circuit has "required a plaintiff alleging retaliation to establish speech protected by the First Amendment." Id. However, the State Defendants did not address the first two elements of Plaintiffs' First Amendment claim, instead focusing their argument solely on the lack of personal involvement by Renckert and Burfoot in the allegedly retaliatory actions.

Plaintiffs' retaliation claims essentially are duplicative of their conspiracy claims. As discussed above, Plaintiffs have failed to demonstrate triable issues of fact with regard to the State Defendants' personal involvement in a conspiracy to deny referrals

to Plaintiffs' daycares, to conduct an illegal search of 641 Jay Street, or to file a false report concerning the search. Accordingly, Plaintiffs' retaliation claims fail for lack of personal involvement.

Furthermore, as to proof of retaliatory motive, Plaintiffs have offered only hearsay and speculation. Mrs. Polimeni said Marion told her that Renckert told Marion that she "disliked [Mrs. Polimeni]. That she disliked somebody who would stand up to her authority and speak out and somebody who might be financially doing better than herself." (Marion 400:2-10). However, based on Marion's testimony, it was not Renckert who told her she disliked Plaintiffs; rather, Marion testified that Plaintiffs' former licensor, Zimmerman, told Marion that "the Polimenis were not one of [Renckert]'s favorite facilities . . . because they stood up to her." (Marion 109:16-19). This is pure hearsay. Marion testified that she knew of two OCFS employees who had Plaintiffs on their caseload who told her that Renckert wanted them "indicated", i.e., to be the subject of a complaint and investigation. (Marion 107:1-108:15). Neither of these individuals were deposed in the eight years between Marion's deposition on August 21, 2006, and the instant motion. One individual's statement to Marion that he "couldn't come up with what [Renckert] wanted[,]" likewise is hearsay. (Marion 108:2-3). Marion testified that it was "common knowledge" that Plaintiffs (and other daycare providers who had

stood up to Renckert) were on Renckert's "black list." (Marion 176:10-22). Again, this is one individual's subjective belief, unsupported by admissible evidence.

**V. Plaintiffs' Request For Further Discovery**

Plaintiffs' demand for an extension of time for further discovery is not only untimely but is not backed by a showing of good cause. On December 3, 2013, Judge Feldman ordered that all discovery must be completed by March 17, 2014, with dispositive motions filed by June 17, 2014 (Dkt #67). After obtaining an extension to submit opposition papers to the State Defendants' summary judgment motion, Plaintiffs now assert in a conclusory fashion that the State and County Defendants failed to disclose documents. The County Defendants' attorney refuted these allegations in a detailed affidavit with exhibits (Dkt #74). Plaintiffs have had more than sufficient opportunity to conduct depositions, review documents, and engage in whatever other discovery they deemed necessary. Their belated and generalized request for more time to come up with "competent evidence" is denied.

**VI.  Conclusion**

For the foregoing reasons, the Court grants the Motion for Summary Judgment (Dkt #62) by the State Defendants (the Estate of Ella Renckert and the Estate of Murcy Burfoot), dismissing them from this action. The claims asserted against the State Defendants

in the Complaint are dismissed with prejudice, and the State Defendants are dismissed and terminated as parties from this action. Plaintiffs' request to conduct further discovery is denied. The Clerk of the Court is directed to delete the party, "Murcy Burfoot", and substitute "the Estate of Murcy Burfoot" in the caption. The Clerk of the Court is further directed to terminate the Estate of Ella Renckert and the Estate of Murcy Burfoot as parties to this action.

**SO ORDERED.**

S/ Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           March 31, 2015

-24-